# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | |
|---|---|
| MICHELLE CHARLES §<br>§<br>*Plaintiff,* §<br>§<br>§<br>v. §<br>§<br>§<br>UTMB HEALTHCARE SYSTEMS, INC.; §<br>aka UTMB (UNIVERSITY OF TEXAS §<br>MEDICAL BRANCH); dba UNIVERSITY §<br>OF TEXAS MEICAL BRANCH AT §<br>GALVESTON, §<br>§<br>*Defendant.* §<br>§<br>§ | **CIVIL ACTION NO.**_____<br><br>**(Jury Trial Demanded)** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Michelle Charles, hereinafter called Plaintiff, complaining of and about UTMB Healthcare Systems, Inc.; aka UTMB (University of Texas Medical Branch); dba University of Texas Medical Branch at Galveston, hereinafter called Defendant, and for cause of action shows unto the Court the following:

## I. INTRODUCTION

1. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 1981, 42 U.S.C § 1983, and The Family Medical Leave Act for Defendant's unlawful employment practices on the basis of race, disability, interference and retaliation.

## II. PARTIES

2. Plaintiff, Michelle Charles is an individual who resides in Harris County Texas, and was an employee of the Defendant at the Defendant's Galveston Texas location at all times material to this Complaint.

3. Defendant UTMB Healthcare Systems, Inc. is a Texas company conducting business in Texas. Defendant is an employer within the meaning of the applicable statutes and employs more than fifteen regular employees. Defendant can be served through its registered agent, Maria L. Gonzalez, at 301 University Blvd RT 0985 Galveston, TX 77550.

## III. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 as it arises under federal law, specifically Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C §1981, 42 U.S.C §1983 and The Family Medical Leave Act. 29 U.S.C. § 2601 *et seq*.

5. This Court has jurisdiction over Defendant because Defendant is a company formed under Texas law and Defendant has purposefully availed itself to the privilege of conducting business in the state of Texas. Defendant conducts business in Texas and has

continuous and systematic contacts with the state of Texas sufficient to establish general jurisdiction over said Defendant.

6. The Southern District of Texas is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this district. Venue is also proper in this district because Defendant operated within this judicial district at all relevant times to the events giving rise to this suit.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. In May of 2019 Plaintiff filed a charge of discrimination against Defendants with the Equal Employment Opportunity Commission ("EEOC"). In the charge Plaintiff asserted that Defendant retaliated against her and discriminated against her because of her race, and disability.

8. Plaintiff files this Original Complaint within 90 days of receiving the Right to Sue notice from the EEOC.

## V. FACTS

9. Plaintiff began working for UTMB, located at 901 Harborside Drive, Galveston, TX 77550 in September of 2016.

10. Plaintiff was hired as a Health Unit Coordinator ("HUC").

11. Plaintiff was the only African American HUC who worked on the night shift.

12. If another HUC was scheduled to work with Plaintiff, it was a non-black employee, and Plaintiff became a target for white employees.

13. As early as July 2018, Plaintiff made a report to her manager Pamela Cruz ("Cruz") about ongoing issues she was having with an employee by the name of Tami McCreight.

14. Plaintiff informed Cruz via email, of an incident where Plaintiff was delivering medication to a patient's room and Tami refused to accept the medication from directly from Plaintiff, and instructed Plaintiff to breach protocol and leave the medication in "the bread box to be administered to patient".

15 Plaintiff told Cruz that Tami was very unprofessional when speaking to her, and that Plaintiff had experienced the same issue with Tami on prior occasion. Plaintiff specifically asked Cruz to address the issue, but Cruz ignored Plaintiff's complaint.

16. Plaintiff made several reports about issues she was experiencing with white employees.

17. On or around February 2019, Plaintiff made a report to Karen Pittiser, when two employees, Catrena and Theresa, refused to relieve her when she needed to take a lunch or bathroom break.

18. Plaintiff again made a report to Lori Forshage, after the issues with Catrena and Theresa continued.

19. From September 2016 to February 2019, Plaintiff's also made complaints to, and about Cruz ("Cruz"), until Cruz transferred to another UTMB location. Thereafter, Chad Connally ("Connally") managed Plaintiff from mid-February 2019 to July 2019.

20. Each time Plaintiff contacted Human Resources to make a report and request help about the harassment she was facing in her department, she was directed back to her department.

21. When Plaintiff began her employment with Defendant in 2016, she asked Cruz about the specific of her job duties as a HUC. Plaintiff informed Cruz that she had previously suffered a stroke, and was asking about job duties in case she needed assistance. Cruz told Plaintiff: "don't worry, the job is easy".

22. On or around September 2017, Plaintiff began having health complications, and had a major surgery, which required approximately three months leave to recover.

23. Upon Plaintiff's return, in or around January of 2018, Cruz began issuing disciplinary actions against Plaintiff. The justification for the discipline was cited as failure to update white boards and failure to secure patient belongings.

24. When Plaintiff asked Cruz about the basis for the discipline, Cruz was unable to substantiate the basis, other than to say she had been informed by plaintiff's "peers".

25. Plaintiff worked the night shift and Cruz worked the day shift. Cruz did not directly supervise Plaintiff's work. At no time did the night charge nurse, who would have been directly responsible for everyone on Plaintiff's shift ever address any issues with Plaintiff about her job performance.

26. During Plaintiff's employment, HUC responsibilities increased to include duties of three different job titles, including the duties of a Mental Health Associate ("MHA"). MHA duties required "sitting" in on mental health patients. Per Defendant's MHA job description, Plaintiff was not qualified, trained or equipped to perform MHA duties.

27. On or around August 28, 2018, Plaintiff sent a letter to Defendant requesting assistance with some of her job tasks. In that letter, Plaintiff stated that the department had been "short staffed for over a year", and responsibilities had increased. She asked for assistance with the changing the white boards, handling patient belongings, and covering the front desk.

28. The following day, August 29, 2018, Cruz issued a written disciplinary action to Plaintiff.

29. Each time Plaintiff was written up, it was a predetermined writeup without further discussion as to the substantiated basis for the actions.

30. On or around September 12, 2018, Plaintiff filed an internal grievance with Human Resources. She informed HR that the Emergency Room Department was short staffed and that she was the only HUC scheduled to work the night shift; she had to cover the front desk, and both sides of the ER when each side should have had its own HUC.

31. In that grievance, Plaintiff also informed HR that she was being accused of not completing the white boards, but she had proof the whiteboards where not completed by other HUCs.

32. Plaintiff also asked HR to implement a "team work environment and not one of fear and retaliation", and that the disciplinary action be removed from her file.

33. Drew Walker ("Walker"), HR Compliance Specialist, received Plaintiff's complaint. However, he did not address it. Instead, on September 19, 2018 he forwarded it to Christine Wade ("Wade"), and Administrator in Plaintiff's department.

34. In response to Plaintiff's grievance, on September 27, 2018, Wade determined that no additional help would be provided and that there was no reason for her to overturn Cruz's action against Plaintiff.

35. On or around October 17, 2018, Plaintiff's health began to decline and her Primary Care Physician ("PCP") excused her from work until October 19, 2018.

36. In November of 2018, Plaintiff received a Gem Award for "taking initiative and being so helpful with a difficult psych case".

37. Less than a month later, on or around December 4, 2018, Plaintiff was again accused of mishandling Patient belongings.

38. On or around December 19, 2018 a conference call was held with Plaintiff, Wade and Cruz. Wade determined that Plaintiff should not be held responsible for a December 2018 belongings incident because there were too many people involved to determine that Plaintiff was "solely at fault".

39. On January 9, 2019, Plaintiff documented and notified management of an incident involving a patient's wallet that had not been "bagged, labeled, or inventoried", and

informed management that the incident was an "example of how she could have been blamed for something she did do."

40. Two days later, on or around January 11, 2019, Cruz used the December 4, 2018 belongings allegation as a basis for issuing another write up against Plaintiff.

41. On January 22, 2019, Plaintiff again contacted HR.

42. She specifically asked to speak with someone concerning issues she was having with Cruz.

43. Plaintiff again followed up with HR on January 28, 2019.

44. Plaintiff's requests were again ignored and her messages were forwarded to Wade who again determined that she found no reason to over turn Cruz's disciplinary action against Plaintiff.

45. As a result of the stress in the workplace, Plaintiff's health continued to decline. On or around January 31, 2019, Plaintiff was again seen by her PCP and she was taken off from work until February 4, 2019.

46. Plaintiff's PCP notified Defendant in writing about Plaintiff's worsening neurologic symptoms.

47. On or around February 6, 2019 Defendant received Plaintiff's "Leave of Absence Request Under Family and Medical Leave Act" Form.

48. The information provided on that form, listed Plaintiff's condition as: "CVA, HTN, HLD", a condition(s) that began in 2015 and is to last for the duration of Plaintiff's "lifetime".

49. In support of her request for FMLA leave, Plaintiff's PCP informed Defendant that Plaintiff had "a history of CVA with residual foot drop". Defendant was advised that Plaintiff also had "[…] Adjustment d/o" ("disorder") and would need physical therapy, neurology follow up, and cognitive behavior therapy".

50. On or around February 11, 2019, Plaintiff was approved for intermittent FMLA.

51. On March 6, 2019, Plaintiff met with new manager Connally and again expressed her concerns and need for assistance with her job duties. No assistance was provided.

52. On April 23, 2019, less than two months after becoming Plaintiff's manager, Connally, issued a Notice of Intent to Terminate Plaintiff. The basis for his intent to terminate was due to an April 13, 2019 belongings allegation that occurred ten (10) days prior to the write up.

53. In his letter, Connally told Plaintiff that she had an opportunity to tell him "if any of his facts were incorrect, or if there was any reason why [the] action should not be taken." Plaintiff was given until April 24, 2019 at 5:30pm, to respond to Connally's letter or her "termination would be effective as of April 23, 2020 at 5:30pm.

54. Plaintiff responded in writing on April 24, 2019. In her response, Plaintiff detailed her previous reports to management and HR, the ongoing harassment and discrimination she was experiencing, and the unsafe work conditions, and that Defendant never investigated any of her complaints.

55. Plaintiff's letter also detailed that Defendant was aware as early as September 2016 that Plaintiff had suffered a stroke, and asked about specific job duties in case she needed help, but no further discussions about potential accommodations occurred after Cruz told Plaintiff the "job was easy".

56. On April 25, 2019, Plaintiff was placed on administrative leave, and remained on Administrative leave until June 11, 2019. Plaintiff was never informed as to the reason she was being placed on administrative leave.

57. During Plaintiff's Administrative leave, Plaintiff was contacted by Lela Lockette Ware ("Ware"), Defendant's ADA coordinator after Defendant told Plaintiff they had no record that she requested an ADA accommodation. Defendant then gave Plaintiff ADA forms to complete.

58. On or around May 8, 2019, Plaintiff returned the requested ADA forms to Defendant, and defendant told plaintiff that additional medical documentation was needed. Plaintiff informed Defendant that she was under the care of multiple physicians, including a neurologist.

59. On or around May 17, 2019 Plaintiff filed an inquiry with the EEOC.

60. On or around May 21, 2019, Plaintiff again notified Defendant that she was scheduled to under go medical testing and evaluations. She also told Defendant she would need to use her previously granted FMLA leave.

61. On or Around May 28, 2019, Plaintiff filed a complaint with the EEOC.

62. On or around June 4, 2019, Defendant's Department of Internal Investigations began a "fact finding investigation into Plaintiff's complaints".

63. On or around June 10, 2019 Defendant scheduled a call with Plaintiff to discuss her need for ADA accommodations, but during the call, rescheduled for the next day, June 11, 2019 at 9:00am.

64. Defendant sent Plaintiff the letter via email denying any accommodations. Plaintiff did not receive a copy of the letter prior to the call. The call lasted less than fifteen minutes.

65. During the call, Defendant read the ADA denial letter word for word.

66. There was no interactive discussion with Plaintiff, about what, if any accommodation(s) could be provided to Plaintiff. Plaintiff was instructed to return to work on June 12, 2019.

67. Plaintiff again informed Defendant that she was also under the care more than one physician, and ask if defendant reviewed all of her medical records including the reports from her neurologist.

68. Plaintiff was informed that the ADA department only considered information that was on her ADA form, and that Plaintiff that she could provide additional information for review.

69. On June 11, 2019, Plaintiff's neurologist faxed a letter to Defendant again putting them on notice of Plaintiff's condition. However, even after receiving the additional

medical information from Plaintiff's neurologist, Defendant never engaged in the interactive process under the ADA.

70. After her request for accommodations were denied, Plaintiff requested continuous FMLA leave, and was approved on June 12, 2019.

71. On or around June of 2019, Plaintiff's medical evaluations and test showed that Plaintiff has suffered another stroke while employed with Defendant.

72. On July 18, 2019, while on FMLA leave, Plaintiff was terminated from her job.

73. Connally acknowledged that Plaintiff was on FMLA leave, when he called Plaintiff and told her: "UTMB does not usually terminate employees while on FMLA leave."  He followed up with a written termination letter.

74. The justification for terminating Plaintiff was due to Plaintiff's "continued failure to maintain satisfactory work performance standards".

75. However, approximately ninety-six (96) days had lapsed between Defendant's alleged reasons for termination and Plaintiff's actual termination.

76. On or around July 21, 2019, Plaintiff filed for unemployment with the Texas Workforce Commission ("TWC").

77. In response to Plaintiff's claim for benefits, Defendant changed its reason for terminating Plaintiff, and claimed that Plaintiff was discharged from work "due to misconduct connected with the work", and also alleged that Plaintiff never complained about the workload or increased duties."

78. However, Plaintiff has been on leave from the day she hand delivered her response to Connally's April 23, 2019 letter, until the date of she was terminated, and thus did not have any new allegations about performance.

79. Finally, Plaintiff made several reports to management and HR, about her job duties, needing help, harassment, being targeted by management and other non-black employees; as well as working in fear of retaliation, but nothing was done to investigate or rectify the issues.

## VI. CAUSE OF ACTION NO. 1:
## RACE AND DISABILITY DISCRIMINATION IN VIOLATION OF TITLE VII

80. Plaintiff incorporates all allegations made above.

81. Title VII of the Civil Rights Act of 1964, amended by the Civil Rights Act of 1991 protects employees from discrimination based on race. 42 U.S.C. § 2000e-2(a).

82. Defendant intentionally discriminated against Plaintiff's involution of Title VII. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her race and disability within the meaning of the statute.

83. Defendant, by and through Defendants agents, discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment in violation of 42 U.S.C. Section 2000e-(2)(a). The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of race and disability.

84. Defendant, by and through Defendant's agents, discriminated against Plaintiff on the basis of race and disability with malice or with reckless indifference to the protected rights of Plaintiff.

85. Defendant, by and through its agents, intentionally deprived Plaintiff of an equal employment opportunity that was provided to employees with no disability and that was provided to non-African-American/non-black employees similarly situated in violation of Title VII.

## VII. CAUSE OF ACTION NO. 2:
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1981 AND 42 U.S.C. §1983

86. Plaintiff incorporates all allegations made above.

87. Discrimination against an individual based on race is prohibited pursuant to 42 U.S.C. §1981, and 42 U.S.C. §1983.

88. Defendant used the authority given to it by the State of Texas to deprive Plaintiff of her constitutional rights. Plaintiff is a black African-American citizen and is covered under 42 U.S.C. §1981, and 42 U.S.C. §1983.

89. At all relevant times, Plaintiff were qualified for the position she held during her employment with Defendant.

90. Defendant, by and through Defendant's agents, intentionally engaged in unlawful employment practices involving Plaintiff because of her race.

91. Defendant, by and through Defendant's agents, discriminated against Plaintiff with respect to the benefits, privileges, terms, and conditions of her employment in violation

of 42 U.S.C. § 1981 and §1983. The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her race.

92. Defendant, by and through Defendant's agents, discriminated against Plaintiff on the basis of race with malice or with reckless indifference to the federally protected rights of the Plaintiff.

93. Defendant, by and through Defendant's agents, intentionally deprived Plaintiff of an equal employment opportunity that was provided to other non-African American employees similarly situated in violation of 42 U.S.C. § 1981 and §1983 .

## VIII. CAUSE OF ACTION NO. 4:
## INTERFERENCE IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

94. The Family Medical Leave Act makes it unlawful for any employer to interfere, restrain or deny the exercise of or the attempt to exercise, any right provided under [the] subchapter. 29 U.S.C § 2615(a)(1).

95. Defendant is a covered employer, and Plaintiff worked the required 1,250 hours in the previous 12 months and is therefore a qualified employee, under the FMLA.

96. Plaintiff gave Defendant notice of her CVA HTN, HLD, and Adjustment disorder, and informed Defendant of the need for physical therapy, neurological followup and cognitive behavior therapy, as well as additional medical evaluation and testing.

97. Therefore her need for time off work in excess of three days to attend to her serious medical condition entitled Plaintiff to protection of her job under the FMLA. Defendant's actions when terminating Plaintiff were in direct violation of the FMLA.

### IX. CAUSE OF ACTION NO. 5:
### RETALIATION

98. Plaintiff incorporates the allegations above.

99. Title VII and 42 U.S.C § 1981 protect employees that engage in a protected activity from retaliation by their employer.

100. The Family Medical Leave Act makes it unlawful for any employer to interfere, restrain or deny the exercise of or the attempt to exercise, any right provided under [the] subchapter. 29 U.S.C § 2615(a)(2)

101. Plaintiff engaged in conduct protected under Title VII, 42 U.S.C 1981, and U.S.C § 2615(a)(2).

102. Plaintiff was subjected to an adverse employment action at the time, and after, the protected conduct occurred.

### X. RESPONDEAT SUPERIOR AND RATIFICATION

103. Whenever in this complaint it is alleged that the Defendant, did any act or thing, it is meant that the Defendant's officers, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of Defendant's officers, agents, servants, employees, or representatives.

## XI. DAMAGES

104. As a result of Defendant's unlawful conduct, Plaintiff have suffered economic and actual damages, including past and future lost income, back wages, interest on back pay and front pay, future wages or front pay, lost earnings in the past and future, lost benefits under the contract or employment relationship, employment benefits in the past, and employment benefits in the future. Plaintiff have also incurred other actual damages as a result of Defendant's unlawful conduct, including but not limited to past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, and other pecuniary and non-pecuniary losses.

## XII. ATTORNEY'S FEE AND COSTS

105. Plaintiff are entitled to an award of attorney's fees and costs under Title VII, 42 U.S.C. §2000e-5(k) and 42 U.S.C §1988, and 29 U.S.C § 2617.

## XIII. JURY DEMAND

106. Plaintiff request a trial by jury on all issues that can be tried to a jury.

## XIV. PRAYER

WHEREFORE, premises considered, Plaintiff pray that the Defendant be cited to appear and answer herein, and that upon a final trial, judgment be entered for the Plaintiff against Defendant for:

   a. actual and consequential damages, including, but not limited to back pay (wages and benefits);

b.  compensatory damages, including, but not limited to severe emotional distress, mental anguish, humiliation and embarrassment in the past and which in reasonable probability will be suffered in the future;

c.  Punitive damages in an amount above the minimum jurisdictional limit of the Court;

d.  Liquidated damages,

e.  Reasonable attorney's fees, with conditional awards in the event of appeal;

f.  Pre-judgment interest at the highest rate permitted by law;

g.  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

h.  Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

i.  Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Complaint or by any amendment hereto.

Respectfully submitted,

/s/ Lisa Ventress

_____
Lisa Ventress
Federal Bar No. 3471199
Texas Bar No. 24076751
The Ventress Firm, P.C.
17300 El Camino Real Ste. 110P
Houston, TX 77058
TEL. (832)240-4365
lisa@theventressfirm.com

**ATTORNEY FOR PLAINTIFF**